What I would like to say first of all is that having listened to several of the prior cases that deal with independent contractor exception and discretionary act issues, I guess we have what I would deem a whopper of a case because we have had both issues in our case. And the essence of our negligence argument against the government is that the firebreaks on the What did you tell us what you think the standard of review is in this particular case? Yes, Your Honor. Having heard that, I did have a chance to just briefly review the Prescott case and also the Miller case. And actually, in Miller, that standard, in a light most favorable to the nonmoving party, is cited in the Miller case, which is a discretionary act case. And in addition, the Prescott case doesn't seem to address that issue in my from my brief review of it in the past few minutes. But I would point out to the court that the case did rule in favor of the plaintiffs and rule that there was an issue of fact. So I don't know how important that is, but it may mean that they didn't have to recite the standard. In any event, I don't believe or I never saw anywhere where they specifically addressed that. This case seems like a case where there is an intermingling of the merits and the jurisdictional issue, which wasn't the case in some of the others before us this morning. I would say that this case involves the United States as a landowner, okay, just like any other landowner in Washington. I believe that these exceptions are technical exceptions and that our case of negligence against the United States is, to some extent, different because we intend to impose Washington law. So what we're dealing with here now, and hopefully I'm responding to your question, and that is that what we're dealing with now, in my view, is the technical exceptions, the, you know, is there a policy under the discretionary act exception, and also this issue of independent contractor. Was the duty delegated at the time of the fire for fire protection on the ALE? And there are a number of abbreviations here, and bear with me, but I, hopefully the court will follow along with me, and I, it is the government's burden, and I know it's been pointed out a number of times. The, I want to start with the independent contractor exception, and I want to note that the, there is this permit and MOU, this memorandum of the Fish and Wildlife Service agreed to manage the ALE, and it agreed to manage it consistent with this 1993 ALE management plan, and the permit specifically states that the plan was approved by the DOE. But more important, under section 403 of this agreement, the FWS agreed to be responsible for coordination of fire protection on the ALE, and section 5.5 said that until the FWS developed its own plan and upgraded its fire protection capabilities, DOE was responsible for providing FWS fire protection for ALE, and it says on a cost reimbursable basis from FWS. But the basis of our argument is, more importantly, right after, just several weeks after this agreement was entered into between these two federal Now, this was not an agreement between DOE and FLOR, but what happened is, is the DOE sent a letter, and it sent a letter on July 17th, which is in evidence. This letter was directed to FLOR, and it told FLOR that basically fire protection by the Hanford Fire Department on the ALE was to be on a cost reimbursable basis to FWS, and fire protection planning activities were to be coordinated directly with FWS. And then FLOR, in turn, having received that letter, sent a letter to DynCorp, the owner of the Hanford Fire Department, directing them to make the agreement with FWS for fire protection on the ALE. And then, subsequent to that, DynCorp and the Hanford Fire Department, which actually the Hanford Fire Department is just a section or division of DynCorp, negotiated and entered into a cooperative agreement with the FWS. Now, the agreement does not reference, and I just want to point this out to the Court, the agreement does not reference the DOE FLOR contract. But these letters, the letter that FLOR sent to, excuse me, the letter that DOE sent to FLOR, and also the letter that FLOR sent to DynCorp telling them they had to take this action to get reimbursed by the FWS, actually specifically reference the DOE FLOR contract. And this cooperative agreement, the reason why it's so important, is that this cooperative agreement, under which the Hanford Fire Department, that's how they get paid, it only, even though it was supposed to be for fire protection, it only deals with fire fighting. And it doesn't deal with fire breaks or fire protection, or prevention, excuse me, on the ALE, which is also part of fire protection. In other words, fire protection covers the gambit of fire fighting, fire breaks, and other types of fire prevention. And this, if you'll notice the deposition of Chief Good, in that deposition, it's on page 269 of the evidence record, volume 2, he actually is asked, is there a difference between fire fighting, is there a difference between fire protection, is there a difference in the meaning of fire prevention? And he agrees that there are differences in these words. And then the sum and substance of our argument, though, with respect to whether or not at the time of the fire there actually had been a delegation to an independent contractor of the fire protection duty, other than for the fact that these actions of DOE sending, after having entered into the permit and the MOU with the Fish and Wildlife Service, having sent a letter telling Floor, and then Floor in turn sending a letter to DynCorp, basically saying that the only way you're going to get paid now, for the Hanford Fire Department, the only way the Hanford Fire Department is going to get paid is to go to FWS, because they're the ones that are going to pay for this now. And in essence, our argument, and we believe, the facts show, that at least there was an intent here, and the actions of the parties, including Floor, taking the action to DynCorp of sending that letter, actually carved the ALE, fire protection for the ALE, out of the DOE Floor contract. And in fact, the DOE Floor contract did not cover fire protection on the ALE at the time of the fire, and since 1997, when these actions were taken. That's our position, and if you're... Do I understand this, your position is the ALE is in the province of FWS, it's responsible for the ALE, and for fire protection on the ALE, because it's subcontract, or it's contract with the fire fighting group, didn't cover fire breaks? Yes, your honor, and let me just be more specific, and that is that I believe that previously, prior to 1997, I don't think there's a question that there was fire protection, a fire protection obligation provided by Floor, but basically when FWS took this over, it was supposed to It gets carved out of that. Correct, but it was on, because it was on a cost reimbursable basis. Let me just submit this to the court as part of my argument, and it's a question. Why would there need to be a cooperative agreement with FWS, which provides how Hanford Fire Department is going to get paid, unless this concept is that the fire protection on the ALE was taken out of the DOE Floor contract? I mean, there would be no reason for this agreement. It's just that they only entered into an agreement for fire fighting, and not the other aspects, even though they were told to deal with, they being DynCorp at Floor, and then next to DynCorp, was told to go ahead and deal with the Hanford Fire Department directly, and arrange to get reimbursed, and arrange to coordinate the fire protection activities. I know it sounds a little convoluted, but the whole concept is, as I'm looking at the actions of the parties, there would be no other reason for the Hanford Fire Department to get reimbursed, because the government's argument is, is that the Floor DOE contract, they were getting paid for all this. Well, if they were getting paid for all this, how come they have this cooperative agreement, which allowed the Hanford Fire Department to get paid? There'd be no reason other than for this. Okay, so my, our view, and the cooperative agreement only covered fire fighting, but they were told, DOE told Floor, who in turn told DynCorp, which was the Hanford Fire Department, that they needed to take care of fire protection on the ALE, and they needed to arrange with the Hanford Fire Department for fire protection, which covered more than just fire fighting, but that was the only agreement that was made. And hence, the government had retained, at the time of the fire, there was no delegation for anything other than fire fighting on the ALE. Tell me, what obligations did the State of Washington have? Okay. Now, if you're talking about, are you, Your Honor, are you talking about the roadway and the, and what was actually done on the roadway? And what, what obligations did, were they obligated to do certain things, and did the government understand that they had that obligation? First of all, Your Honor, we're, now we get into the policy of the firebreak maintenance on the ALE. Firebreak maintenance, by the way, is, is on the ALE. The roadway, according to Chief Goode, is not on the ALE. The roadway, Chief Goode says, the Hanford Fire Department, they don't have any responsibility for the easement. They say State of Washington did. I don't see anything in the State of Washington's easement that requires them to do anything in relation to fire protection. And in fact, the record bears out that the, the only reason why the Department of Transportation was doing any work on the roadway was not related to fire protection. They were just doing that to keep the road clear. They were doing the burning and the, and the herbicide to keep the road clear. But Is there anything in the easement to the State that imposes any obligation? There is nothing in the easement that imposes any obligation. But my point being, though, because there is in the record some statements of Chief Goode, oh, well, you know, we, instead of doing the firebreaks on the ALE land, we went over to the roadway and we worked with DOT, they, let me just point out, Chief, Chief Goode makes it very clear that DOT did not, that, that DOT is the, that they, the Hanford Fire Department had no responsibility for the road and they were just aiding DOT as a good business practice. But more importantly, the issue has to do with whether the, whether there was an obligation on the part of the United States to deal with firebreaks on their own land, not on the easement. But the easement does not address that at all. In fact, there is no requirement of the Department of Transportation to answer your question. And I'd just like to quickly move along to the independent contractor exception because I think my time is starting to run short. And what I want to say is there's a two-prong test here under Berkovitz. And the first part of the test is, you know, this issue of whether there was a policy and whether the 1993 You mean the discretionary function exception? I do apologize. And if I've stated it wrong, I apologize. I'm a little frantic up here and I'll just calm down. Take your time. Okay. First of all, the 1993 ALE management plan, one of the things that the court found, the district court, is that it cited some sections that, the disclaimer section of the ALE management plan. But the court never commented about the fact that in the permit itself, right on, right in the permit, right after the legal description, it says that the FWS is to manage the ALE consistent with this plan. And in addition, it says that the DOE approved this plan. So there were further actions after this plan was written in 1993. The ALE actually was, excuse me, this plan was actually approved. And I think that's really important. And in addition to that, the Fish and Wildlife report of the fire actually recognized this plan as being the plan that was enforced at the time of the fire. It's right in their report. And I, in addition to that, even if the second, and I'll just quickly state this, under the law, even if the second, the first prong is not satisfied, I would submit to the court that the Discretionary Act exception does not apply in this case. The argument here is that, is the U.S. as a landowner, just like any other landowner in Washington. And I would submit that the court compared two recent Ninth Circuit cases for this. One of them is O'Toole, which is a 2002 case, and Miller, which is the one cited by the government, which is a 1998 case. And in the 2002 case, in O'Toole, this had to do with the government alleged, an allegation the government failed to maintain an irrigation system on its own land, which in turn resulted in damage to the plaintiff's land. And in that case, the court held that the U.S.'s duty as a landowner was not the kind of policy decision that this discretionary exception protects. And this is this other issue about the court stating, the danger that the discretionary function exception will swallow the FTCA is especially great where the government takes on the role of private landowner. And in that case, by the way, the irrigation system had previously been maintained, and then they let it not, you know, go to become unmaintained. Very, it's very interesting because it's similar to our case where it was maintained and then not maintained, the fire breaks. But if you compare that to Miller, if you compare that to Miller, which is a firefighting case, which dealt with the allocation of resources to do different fires caused by a lightning storm, that is a firefighting case. We're not dealing with firefighting here. We're dealing with an allegation of the U.S. as a landowner. Based upon that second prong, we don't believe the discretionary act exception can apply. And I'd like to reserve what little time I have left for rebuttal. That's fine. Okay. Mr. Tangvold, please proceed. Thank you, Your Honor. May it please the Court of Counsel, my name is Rolf Tangvold. I'm an assistant U.S. attorney out of Spokane, Washington, and I represent the Department of Energy and the United States Fish and Wildlife Service in this case. To address some of the things that Mr. Wolf talked about directly, one of them is the random of understanding between the Department of Energy and the Fish and Wildlife Service somehow changed the contract between the Department of Energy to FLUR and FLUR's subcontract to the Hanford Fire Department. I'd indicate, first off, I think the argument is that they aren't parties to the contract and they couldn't have changed it at all. But second, the facts, I think, are what's key here. And if I could point, Your Honor – I've brought them into my supplemental excerpt of record. Page four of the supplemental excerpt of record is the subcontract extension, which says that the Hanford Fire Department will continue to provide fire prevention all the way through 2001, a year after the fire. That subcontract extension wouldn't have occurred if the fire prevention activities weren't required through the subcontract. Chief Goode tells us time and time again in his deposition, we just do firefighting. We don't do protection. We don't do prevention. What do we make of that? Well, I think that's not – I would disagree with the manner in which that's phrased. I think what he said is we don't do fire prevention on the easement. We do fire prevention on the rest of the Hanford site, but the State of Washington is required under the easement. No. Where do we find that? Sure. It's on page 140 of the supplemental excerpt of record, Your Honor. And again, this was an issue of – that's an issue of liability. We haven't – to be honest with you, I haven't brought a – a joinder for the State of Washington in or anything like that, because that's liability. And at this point, I'm – I was focusing on jurisdiction under the Federal Tort Claims Act. But if I could direct the Court's attention to page 140 of the first paragraph, it says the grantee, by acceptance of this conveyance, hereby releases a grantor of damages and claims for damage, which may result from the construction, operation, or maintenance of the grantee, which is the State of Washington. I'm – I'm just referring to the deposition of good. Now, what did good say? He always said we just – we didn't do prevention. We didn't do – That's – again, Your Honor, I think that there's a distinction between what he said – what he said was that on the easement itself, that's the State of Washington's responsibility. Well, that was what I thought you were going to be showing me in the deposition, was that he said it's only on the easement that we don't do it. It is in – it is in his – It is in his declaration, Your Honor. The page where he said that the State of Washington is responsible for the easement, I don't know the specific page number of the declaration. I'm sorry. I do have a number – and you may recall in the reply brief that there was an allegation made by – by Mr. Wolf that the Hanford Fire Department did nothing with respect to fire prevention, and I do have a number of locations in the – in Chief Good's deposition where he indicated specifically that they did do fire prevention activities up to – up to the time of the fire. If Your Honor would like, I'd be happy to provide those. I don't know if Your Honor wants them or not, but – All right. If we want them, we'll order it. Okay. There are a – there are a dozen references, Your Honor, where Chief Good said that they went out and did controlled burning. Are those referenced in your brief? They – they are, Your Honor, although I have to admit that the way that this works, and he has the reply, that – that after seeing the reply and seeing the argument in the reply, I wish that I had had an opportunity to – to further brief. But let me – let me tell you where they are so that – SCR page 31 and 32, paragraph 31 says that Chief Good did – was involved with the spraying of herbicides, historically disking, that ended after, I think, 1996, was involved with controlled burns. SCR – or excuse me, it's actually for reference page 272 indicates that the Hanford Fire Department themselves did controlled burns a half a dozen times in 1999. And then Chief Good says that all maintenance activities regarding fire prevention, including the use of fire breaks that occurred on the Hanford site, were performed by employees of the Hanford Fire Department. That's found at SCR pages 33 and 34, paragraphs 38. And then also Mr. Kline, who is the manager of the Hanford Fire Department, indicated that the – that they relied on the subcontractor for fire prevention as well, pursuant to the contract. What I think is interesting, Your Honor, is SCR page 7. That shows or demonstrates, I think, the amount of money that was spent for fire prevention. And – and it's not just the amount of money, which I think is – is surprising. It's in the tens and hundreds of millions of dollars per year. But SCR 7 shows that fire prevention activities continued two years before the fire, over $100 million expended. The year of the fire, I think, is $160 million expended. The year after the fire, $80 million expended. And that modification at page – at SCR pages 16 – it's either 16 or 17. It's – it's on page 17 and 18. That's – it talks directly about fire prevention, that the Hanford Fire Department, even after the Memorandum of Understanding, even after the fire, was continued to be obligated under the subcontract to provide fire prevention on the – on the air. So the – which entity was this? The Hanford Fire Department, which is the subcontractor, Your Honor. And they were paid 10 – I think over $80 million for the year pending, or the year after the fire occurred. Let's assume for the moment that there was a contractual obligation to provide for prevention and protection. Did the government have a duty to oversee and see that this was done? Now, there was a letter from Chris a month before the fire, who says, oh, God, we're – you know, we're in bad trouble. The mother of all fires letter, I think, is the one you're referring to. Yeah. Yeah. The question is whether the United States, as the owner, maintains some obligation. The answer to your question is, as a landowner, they do have some obligation. However – and there's a however there – I think it's Logue that has indicated that the United States can meet that obligation by contracting and can contract the – for expertise and for areas such as fire prevention to contractors and subcontractors. I'm not sure that they can contract it, but if they become aware, as Chris seemed to have become aware, that things were awry, did they have an obligation to do something about it? First, Your Honor, I don't believe things were awry. That's an issue of negligence rather than jurisdiction. If – if I take the hypothetical, if they have – if they see that something is awry, do they have some sort of a duty? I don't know if they have a duty, but they do have a duty – they have a responsibility to make sure that they're getting the benefit of what they paid for under the contract. And Mr. Christensen was the – the point of contact for that for the Department of Energy to determine whether or not they were receiving the benefit of the contract. So to the extent that they have overall supervision, I think is the way I would put it, I think that they do have this – this umbrella of supervision, but specifically the day-to-day activities from the Hanford Fire Department. If I can rephrase, I think, what Your Honor is arguing is, is there a negligent supervision argument in the case. It was not raised and it has not been alleged by the plaintiffs at all. The only allegations raised are that the Department of Energy improperly failed to prevent the fire and improperly failed to fight the fire. Those are the allegations that were raised. There's no inappropriate supervision or anything along those lines. Interestingly, I did address those issues in my brief before Judge Shea, just in case there was an allegation raised later. But it's not before Your Honor today. It's not an allegation that's been raised. There is one other thing that Mr. Wolf said on independent contractor exception that I'd like to touch on. He said that the – that this 1997 agreement somehow changed the landscape of Department of Energy to FLUR to Hanford Fire Department for fire protection. Somehow it's been changed, and it's just not the case. Supplemental excerpt to Record, page 75, at paragraph 1.4, identifies – now, this is the document that he thinks changed the landscape, but it says right in the document, paragraph 1.4, that there are DOE contractors referred to at attachment 2, which is at SCR 83. And it says they are – which are delegated responsibility by DOE for certain aspects of operations that may be on and may affect the AL. So the – the contract itself, the testimony of Mr. Klein, the manager, the testimony of Chief Good from the Hanford Fire Department, are all supported by the very document that the plaintiffs rely on that say there are contractors out there, and they're still doing their job, and they should – and then their job's going to affect the AL. Part of those contractors who are specifically identified as DYNCOR, which is the Hanford Fire Department, and interestingly enough, the contract continued, not only before the fire, during the fire years, and after the fire years. Judge Shea correctly determined the facts in this case, that – that there was a contract that issue, that two parties, not parties to the contract, didn't change the contract between Fleur and the Hanford Fire Department, and that all actions, including the testimony and the actions, including payment of tens of millions of dollars, are all consistent with the Hanford Fire Department doing fire prevention on the AL, also as addressed at page 75 of the memorandum that the plaintiff is relying on. If I could, I'd move to the discretionary function exception. And in that case, the – the judge, Judge Shea, found it as an alternative and – and determined that even if for some reason the independent contractor exception, or there was no contract in place, the discretionary function exception of the Federal Tort Claims Act still removes subject matter jurisdiction in his courtroom. The – the case there, and I know that Your Honors are familiar with it. I don't know if it's Gobert or Gobert or how to say it either, but I call it Gobert. I think it's probably because of Dobbert in the criminal matter, but I call it Gobert. And if I'm wrong, I apologize to the – to whoever Goberts are. Gobert and Berkovitz set forth a two-part analysis. And I know Your Honors know it, but only the first prong is contested by the plaintiffs here today, and that is were the alleged negligent conducts – did it involve an element of judgment or choice? And Berkovitz is very helpful in that regard because Berkovitz says, is there a statute or regulation that was – that was violated? And if there isn't a statute or regulation violated, then the first prongs met. The closest that – that the plaintiffs have come to – by the way, none of us were able to find a Federal statute or regulation, and I think that Judge Shea himself said in his – in his review he wasn't able to find one either. The closest that we come is a 1993 A.L. management plan which was prepared by a subcontractor named Battelle, five, six years before – seven years before the fire. And in that document itself, Judge Shea in his order indicated a number of things. Number one, that the document on its face says that it's not a – it's not a statute or regulation of the United States. Rather, it's intent – quote, intended for guidance. It is something that the – that the A.L. – that the manager of the A.L. can utilize in determining their own judgment or choice. And there was a quote, if I could find it here. Yes. It's at SCR page 98, paragraph 1.2. It says that the Department of Energy retains the final authority over all decisions and policies. Let me kind of try to think this thing through with you. No one would suggest that the landowner didn't have an obligation to protect against fire. The – the United States has the same obligation in the State of Washington as any other landowner, yes. Okay. So then where does the discretion come in, whether you enter into a contract and delegate it to others or whether you decide to do it yourself? That is one of the areas of discretion that I discussed in my brief before Judge Shea. I believe it was the Andrews case that I cited. It's been a year, so – So where else does discretion come in? If they exercised their discretion not to ever have any firebreaks, I don't think that's a discretion that would be tolerated by anybody. And that's not – that's not what they did, Your Honor. There were firebreaks. Before – up to 1997, there was a disking of firebreaks on the outside of the fence line where the State Highway ran through. There's the State Highway, then there's 75 feet where fences are on both sides. And then there was disking outside the fence line on the ale. And that continued, I think it was 95 or 96, up until there was a complaint for the dust. I'm just going to draw back to help us. You're saying that the discretionary exception applies. It does. And what is the discretion that was exercised by the government, which then takes them out of – Yes. How to go – and Judge Shea included this in his order – how to go about providing fire prevention, where to provide it, at what distances to provide it. It was essentially the who, what, where's, when's, why's, and how's. It is set forth by Judge Shea that there is no directive that requires the idea of putting a firebreak and how to go about doing that. That's what I wanted to ask you about. You could shed a little light in terms of what the record says about what a firebreak is. And because my simple understanding was it's an area where someone has gotten rid of vegetation, so an existing fire will starve and won't be able to get across it. And that there – you know, is there an element of judgment as to how wide those have to be and where you do them? And wherever you do them, I guess you're killing something that was there. In Chief – it's almost like you were at the deposition, Your Honor. Chief Goode indicated during his deposition that anything void of vegetation is a firebreak. And he also identified that the State Highway itself is in and of itself a firebreak, void of vegetation. There is a policy consideration as to how wide you make the – a disking, if I could use that as an example. And he indicated that the 1984 fire jumped over the Columbia River, which obviously is a firebreak. And so firebreaks are not the only thing that a firefighter would rely on. His testimony, his declaration is that that would be short-sighted. And so they used things that are void of vegetation as a firebreak, and it was what he called an anchor from where to fight the fire. So to try to answer your question directly, there is discretion in how wide. And there's obviously a host – and Chief Goode at the last paragraph of his declaration put in all the different things that he thinks about and the factors he considers and how he puts together fire prevention. One, this is an area of some – the Hanford Fire – the Hanford Nuclear Reservation has issues with respect to the conservation of the land out there, has issues with respect to neighbors, relationships with neighbors, relationships with local state entities, including the Clean Air Board that was out – that had a complaint in 1996 about the disking. And Judge Shea, I think, in his order – I think it's at page 810 of the record, Your Honor, of the excerpt of record – specifically identifies the fact that there is discretion in those decisions. I would also indicate, moving to the second prong, that there's no allegation that – the only thing that's being argued in the second prong is that there was no proof that Judge – or, excuse me, that Chief Goode actually did some sort of a policy analysis. We have the issues that he identified as being specific at the end of his declaration, but the argument is that there's no proof that he actually went through that process. I think Berkovitz is pretty clear that the actions have to be, quote, susceptible, end quote, to a policy analysis. I don't think that the proof needs to be required that he actually did go through that analysis, although in this case, he did, and he indicates that in his declaration. The plaintiffs, on the third and final point, argue that there's some distinction between the operational and management decisions, and that there – and that because I think it was Indian Towing in some cases that precede Gobert, that there should be some sort of a distinction that the discretionary function exception should only apply in cases in which there's operational decision – or management decisions versus operational decisions. Frankly, Your Honor, I think Gobert's right on point on that, and it indicated that there is a nonexistent dichotomy between the two. Gobert specifically set forth that discretionary function reaches both. I've set that forth in my brief, and I hope it's clear. But the United States Supreme Court has, in my view, and what I would offer to the Court, has resoundingly rejected the argument. If the Court has other questions, I'll be happy to try to answer them. I insisted that it was Dobert, and then I was informed that they themselves pronounce it Dobert. Gobert. Well, thank you, Your Honor. I've cited – I've cited that case now probably 20 times, and – It feels like it's still there. And I'm afraid that I – I was worried the whole time whether they were French or not. Thank you, Your Honor. Okay, Mr. Wolf. I wanted to respond to a couple of statements made by Mr. Tangvold. And first of all, I want to state to the Court that I happen to know Mr. Tangvold, and I know he's a very honorable person, but I believe some of his statements may have been misleading with respect to the DynCorp contract and the $80 million. DynCorp – I had it marked here, but I don't really have time to set it forth. DynCorp provided many, many, many services to the Hanford site. Emergency services were one small part of what DynCorp provided. So that $80 million figure and the attachment that talked about the ALE that is cited, you know, they provided utilities and transportation infrastructure and all kinds of other aspects to the Hanford site. So this $80 million and the reference to the ALE in that document does not have anything to do with whether or not there had been any change in the fire protection on the ALE insofar as it relates to the DOE floor contract. That's the first thing. Then the next thing I wanted to say is that – that I wanted to just remind the court that there are two cases cited by the government with respect to whether or not this is a guideline or this is a policy. And of those two cases, one is Miller and one is Aragon, and I would submit to the court that those two cases had some items that I would consider guidelines because they didn't directly address this point. The policy that was in the 1993 ALE or ALE plan was – it was very specific. You have to provide fire breaks along the ALE boundaries. Okay. And then the next thing is, is that the DOE report and Mr. Christensen, who is the DOE's fire protection engineer, in his deposition said that the fire breaks had not been maintained and, in fact, had they been maintained, his opinion – Mr. Christensen's opinion was it wasn't that the fire may have spread from the roadway to the government land. In fact, his opinion was is that it most probably would have spread from the roadway to the government land. And I would just remind the court about the comparison between O'Toole and Miller because I think this Gobert – hopefully I pronounced that correctly – has been cited, but I don't really think that relates here because these two decisions that I'm describing, O'Toole and Miller – Miller's firefighting, which I don't think applies here, and O'Toole relates to the government as a landowner – these are both decided way after Gobert. And thank you very much. Thank you very much. We appreciate the excellent debate of counsel, and we will submit now the case of Autry v. United States. However, if the panel wants further briefing on any of the issues covered, we'll defer submission by order and ask for the briefing. But unless you hear from us, it's submitted. Thank you.
judges: B. Fletcher, Gould, King